■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RENE SHARP, Appellant.—Judgment of Supreme Court, New York County (Rose Rubin, J., at jury trial and sentence), rendered June 3, 1987, which convicted defendant of rape in the first degree (Penal Law § 130.35), sodomy in the first degree (Penal Law § 130.50 [1]), robbery in the first degree (Penal Law § 160.15 [3]), robbery in the second degree (Penal Law § 160.10 [2] [a]), and assault in the second degree (Penal Law § 120.05 [2]) and sentenced him, as a second felony offender, to concurrent indeterminate terms of imprisonment of from 8 to 16 years on the rape, sodomy and first degree robbery counts, 5 to 10 years on the second degree robbery count and 3 to 6 years on the assault count, is affirmed.

Although it was error to permit the People's witness, who had not been qualified as an expert, to give opinion testimony, the error was harmless. *(People v Crimmins,* 36 NY2d 230, 242.)* A Police Department lab technician, not qualified as an

expert, was permitted to testify that he detected the presence of an antigen for blood type A in vaginal slides of sperm taken from one of the victims, which defendant, as a nonsecretor, could not have produced. It was improper to then permit him to give his opinion that bacteria contamination over the course of four months could have given a false reading or that the reading was the result of actual type A blood, rather than the secretion of a person with that type. This testimony was not within the range of ordinary training or intelligence of the jurors and went beyond the types of conclusions jurors could have reached based upon their own day-to-day experiences, observations or knowledge. *(People v Cronin,* 60 NY2d 430, 432-433.) As such, it was testimony which should have been given only by an expert, for which this witness was not qualified. However, given the overwhelming direct and circumstantial evidence of defendant's identification as the perpetrator, the only issue at trial, the error was harmless. *(People v Brown,* 115 AD2d 610, *lv denied* 67 NY2d 940; *People v De Camp,* 138 AD2d 858, 860.) Here, the victim of the rape, as well as her spouse, who was also a victim of defendant's crimes, knew defendant and permitted him to live in their apartment for approximately one week prior to the crimes. The fact that defendant wore a ski mask, covering only his mouth, ears and upper forehead, does not weaken the victims' identification. Moreover, one of the victims recognized defendant's voice and was called by name during the attacks. Additionally, the victims maintained a deadbolt lock on their apartment door and the attacks were committed at a time after defendant had been let inside the apartment to sleep for the night. Investigations after the crimes revealed that there were no signs of forced entry at the door or windows and defendant was not to be found. This circumstantial evidence pointed to defendant as the perpetrator. Under these circumstances, there is little probability that the jury would have acquitted defendant but for admission into evidence of the laboratory technician's testimony, which error was not of a constitutional dimension. *(People v Brown, supra).* Concur— Sullivan, Ross, Kassal and Smith, JJ.

Murphy, P. J., dissents in a memorandum as follows: The defendant has been convicted, after a jury trial, of rape in the first degree, sodomy in the first degree, robbery in the first and second degrees, and assault in the second degree.

The principal issue at trial was whether the defendant had been correctly identified by the complainants, Barbara Shepard and David Browne, as the man who on the night of June

13, 1986 entered their bedroom, robbed them and then raped and sodomized Ms. Shepard and stabbed Mr. Browne. The defendant, who had been staying with the complainants at the time of the incident, was familiar to them and the complainants claimed to have recognized him notwithstanding the dark conditions under which their observations were made and the fact that their assailant's face was almost completely obscured by a ski mask. In addition to her recognition of the defendant's form, Ms. Shepard stated that she recognized his voice. Proof of a circumstantial sort also pointed to defendant's direction: he had been given access to the complainants' apartment on the night in question and there were no signs of forced entry.

Although the above-described evidence was sufficient to support the jury's verdict, other evidence, also admitted as part of the People's direct case, was potentially exculpatory. Police Officer Francis Harten testified that he performed certain tests upon semen samples taken from Ms. Shepard just after the rape. Harten stated that one of these tests showed that the semen samples contained a blood antigen. At the People's request, Harten explained that an antigen is a chemical present in the blood but that it may also be found in other bodily fluids, including semen, provided that the individual is an antigen secretor. In response to further questions propounded by the Trial Assistant, Harten disclosed that the defendant had been tested but had been found not to be a secretor.

Plainly, the jury could have concluded from Harten's testimony that the defendant was not the assailant since the import of his testimony was that the rapist, unlike the defendant, was an antigen secretor. The People, however, attempted to blunt the exculpatory force of their witness's disclosure by eliciting from him, over strenuous objection, further testimony to the effect that the positive antigen reading was consistent with blood having been present in the semen samples and that it might also have been caused by bacteria. In summation the prosecutrix elaborated at will upon the first of these hypotheses, suggesting that perhaps the defendant had had a cut on his penis or his hand and that the blood from his wound had found its way into the victim's vagina and from there into the semen samples that were later analyzed. There had, however, been no evidence that any blood had been found in the victim's vagina or in the semen samples retrieved therefrom. Indeed, the only pertinent testimony on the subject, that of the doctor who examined Ms.

Shepard in the aftermath of the rape and took the samples, was to the contrary. She stated that she had found no signs of trauma, laceration or blood in the victim's genital area.

The ground of defendant's objection to Officer Harten's testimony was that it contained opinions which should have been rendered, if at all, by an expert in forensic serology. Harten, who had never testified, much less testified as an expert, and whose entire background in the area consisted of one undergraduate course in histology and less than a year of on-the-job training in the police laboratory, was not an expert and was not qualified as such. Indeed, the court in a completely unexceptionable exercise of its discretion expressly refused to qualify Harten as an expert, noting that "he is by no stretch of the imagination yet an expert", a conclusion which the court had occasion to reiterate near the end of Harten's testimony when she observed "[H]e's not an expert, it's now clear beyond a doubt." Harten's above-described testimony was nevertheless permitted by the court, apparently upon the theory that he would not be supplying expert opinions but would merely be testifying as to the tests he had performed and their results. It is clear, however, that Harten's testimony was not so confined. He testified not only as to what he had done and observed, but attempted at the People's urging to explain how positive antigen readings might have been obtained from the semen of a nonsecretor. Obviously, nothing within Harten's very limited direct experience would have enabled him to speak reliably upon the presumptively extraordinary circumstances under which antigen analysis might yield false positive results. And, equally obvious, no witness, not even an expert, should have been permitted to speculate, not only without evidence but contrary to the evidence, that the positive antigen reading was attributable to blood in the semen samples.

The error in the admission of Harten's testimony was, of course, magnified when the Trial Assistant in her closing not only repeated what she had earlier asked Harten to assume without evidentiary foundation, namely that blood might have infiltrated the semen samples, but went beyond Harten's testimony to suggest the precise means by which the infiltration had occurred. Without any supporting evidence, the Trial Assistant posited, over objection, that the defendant had had a cut on his penis or his hand and that in the course of the rape the blood from his wounds had been deposited along with his semen in the victim's vagina. The jury thus had placed before it an inculpatory theory without any basis in the record. Not

only was the jury invited to speculate that there had been blood in the semen samples, it was invited to compound its speculations by supposing that the blood was the defendant's. It was in this way that evidence from which the strongest exculpatory inference might have been drawn was made to seem not only consistent with but highly probative of the defendant's guilt.

I do not think it possible to conclude that the above-cited errors were harmless. It would seem clear that had the jury's view of the evidence not been clouded by incompetent and wholly speculative "explanations", there might very well have been a different verdict in this case.

Accordingly, I dissent and would reverse the judgment appealed from and remand the matter for a new trial.